Good morning, Your Honors. May it please the Court, I am Robert Popper of Judicial Watch and I represent the Plaintiff Appellants. I would like to reserve five minutes for rebuttal. Manage your own time. Your Honors, when the Supreme Court enjoined the election of delegates under the All Rights Act on December 2, 2015, it necessarily found that the Plaintiff Appellant's right to relief was indisputably clear. We submit that the issue before us today is, has anything happened since that ruling that counsels a different result? And we respectfully submit that the answer is no. This case is not moot under the extremely exacting standards that apply to mootness. And what's more, the Plaintiffs are entitled to prospective relief because there is a cognizable danger of a recurrent violation. That standard is best set out in TRW v. FTC, this Court 1981, 647 F. Second 942. And while it sets out the standard for mootness as a mere possibility of a recurrence, it also says for prospective relief there must be a cognizable danger of recurrence, something more than mere possibility. And there it's citing U.S. v. W.T. Grant. Did you ever seek to enjoin the Constitutional Convention from occurring? No, Your Honor. What we did seek to enjoin at one point was the seating of delegates on the theory that that was actually an election of delegates. At the point at which the election of convention delegates was canceled by Nayapuni on December 15, 2015, they then moved to seat all candidates and to hold a convention, a shortened convention on that basis. And we moved in the Supreme Court for contempt to enforce the Court's order on the theory that that was actually an election in which everyone won. The Supreme Court rejected our motion. We never moved to enjoin the convention as a convention. So what's your best argument that this case meets one of the exceptions to the mootness doctrine? Well, Your Honor, if we have to, and this applies both to mootness and to our right to prospective relief, if you look at what the defendants have done every step of the way through this litigation, their intentions are clear. On OHA's website, Office of Hawaiian Affairs, I may lapse in and out and say OHA. It's not as bad as an environmental case, but... Yes. On OHA's website, they have a statement of goals that says, OHA's goal is for all Native Hawaiians to participate in the nation-building process and to allow them to decide what form a Hawaiian nation will take. And the emergence of a Native Hawaiian government is extremely important to the Office of Hawaiian Affairs. That was on their website when this lawsuit started. We cite that in paragraph 64 of our complaint. And that is on their website this morning, as of this morning. But the election of the delegates has been canceled, correct? Yes, Your Honor. And the ratification vote has been canceled? No, Your Honor. The ratification vote will not be held by Niapuni. But in Niapuni's press release where they announced this, they said that they hoped that a broad-based group would now be best able to advance that ratification vote. The group that was primarily pushing this has disbanded, correct? Well, Your Honor, they are one of two private groups. Yes, I understand. It's the Akamai Foundation, which is not dissolved, and then there's all the other defendants. When, then, if it's not being canceled, then when's the date for the ratification? There is no date, Your Honor. It has been... When Niapuni said it will not hold the ratification, even when Niapuni was scheduled to hold the ratification vote, it hadn't been scheduled. And has the other group said they're going to schedule the ratification vote? The Akamai Foundation, the other defendant, has not. There are private groups that are trying to fund it, as far as we are aware. Well, there's no funding for it? No government funds have been made available now. I wouldn't say there's no funding for it, Your Honor, because the government can change. There is, at present, no funding. Well, leaving aside mootness, why is this ripe? Pardon? Why is it ripe? I mean, we have... We know it's moot as to the prior election. I mean, I think that's... It's not going to be held. Your argument seems to be it could happen in the future, but why is that ripe for our consideration now? Well, Your Honor, for both ripeness and mootness, we have to consider what the defendants are trying to do. When we started this litigation, we were in much less danger than we are now in terms of a violation of our rights. They hadn't had a convention. They hadn't written a constitution. The district court said that was speculative. The defendants argued that was speculative. That's no longer speculative. We have a constitution, and all the parties, including the dissolved party, Nayapuni, have indicated that they would like to hold a ratification vote. But if we were to write an injunction, what is there left to enjoin? What I would enjoin would be to take the language from our complaint and say that this court enjoins the defendants from actually conducting or facilitating the use of the role in any election. The role was created by a state agency. It was created on race-based and viewpoint-restricted grounds. The Office of Hawaiian Affairs clearly believes it could not hold this election, and that's why I found Nayapuni... Well, let's look at the language of your preliminary injunction, because what I've highlighted here, and you tell me if there's a part that I'm missing, but it seems like the main purpose of your preliminary injunction is to prevent defendants from undertaking certain voter registration activities and from calling or holding racially exclusive elections for Native Hawaiians. Well, that's not from the prayer for relief. Looks like that's your request for preliminary injunction. And that's the only thing in front of us right now. Yeah, I'm sorry, Your Honor. There was the motion for preliminary injunction in the district court, if that's what Your Honor is referring to. Well, that's what you're appealing. Yes, Your Honor. So, what do you think is in front of us right now? I mean, because this is all that's in front of us right now. Well, Your Honor, as we have said all along, and as we set out in our reply brief, we have always said that this is a process and we seek to enjoin the process. This is, if you will, a bar graph. And where we are in that bar graph, where we are in the progression has changed. And it has changed due to the deliberate actions of the defendants. At the time we were seeking to enjoin a convention, an election of delegates to a convention, we have always said, and we set this out, chapter and verse where we say this, not just in our complaint, but in our preliminary injunction papers at the district court level, at this court level, and we have always said that we're trying to enjoin the, we have a term of our election, convention, ratification process, which really enjoins, as we said in our complaint, the use of this role for any electoral purpose. It's the same role for a ratification election that it was for an election of delegates. It was made exactly the same way. There were the same race-based and viewpoint-based restrictions. It was still made by a state agency. All of those problems in here. And there's no significant difference if it's used for a ratification election, which is more consequential. In fact, that would probably be worse than an election of delegates. Why isn't it speculative? Well, Your Honor... Because you've talked, they've had funding issues. I mean, it seems like the primary organization, at least from my review, that was pushing this is dissolved. The election's dissolved. Why isn't it speculative? Well, Your Honor, first, with respect to dissolution, there is Supreme Court precedent indicating that where there are still defendants against whom relief can be obtained, that is not a bar, that does not make the case moot. But the primary defendant, I think, about which you're concerned, is not a party to the action. That's the new entity, right? Your Honor, I would not agree that they're the primary defendant. They are the cutout, or it might be a New York term, they are the party that was going to stand in for the Office of Hawaiian Affairs. As the Office of Hawaiian Affairs expressly says in their board minutes, they don't think they can hold this election, they're going to have a state action problem, so let's get Nayapuni. Nayapuni is created, and in the space of four months, it's signing contracts. And it's dissolved, and now you think that there's a new entity that will probably step into the dissolved entity's shoes, but it has not yet, and they're not a party to this case. So I guess what I'm leading to is, we can't enjoin a non-party. So where does that leave you with this? Enjoin OHA, Your Honor. Enjoin the defendants, but particularly OHA, from appropriating another $2 million and giving it, as soon as this litigation ends, to another entity, so that in four months, that entity is going to hold an election. We'll be scrambling in court to try to enjoin that, and join any of these... Well, we're here, I mean, we're here. I mean, we can, we respond to interlocutory appeals. Let me ask you one question, just a second, Judge Callahan, and I'll... Let's assume that we have jurisdiction, that there is, it's not moved, and it's ripe. This is a preliminary injunction appeal. What relief, you obviously can go back to the district court and seek the ultimate relief you're seeking, in this case, in the form of a permanent injunction. Why do you need a preliminary injunction? Well, Your Honor, this gets back to the standard of a cognizable danger of a recurrent violation. And in order to establish that, the court in Laird, again, this court, 73 F. 3rd 852, this is 1995, stated, and I'm paraphrasing as I read, the isolated or recurrent nature of the infraction, the defendant's recognition of wrongful conduct, the extent to which the defendant's characteristics might tempt him to commit future violations, the sincerity of assurances against future violations, and that court actually held in the case before it that the repeated justification of wrongful actions was enough to show a likelihood of future violations. We have a promise that they're going to hold this election. OHA remains dedicated to this. Nayapuni bowed out for litigation purposes and said on its way out, we want another entity to conduct this. Indeed, Your Honor, aside from the fact that Nayapuni was formed more or less expressly to allow OHA to hold an election it didn't think it could under the United States Constitution. It set a rushed election schedule, as it admitted, in a now-withdrawn document on its website, to reduce the risk of this kind of problem occurring and slowing down the election. After Justice Kennedy issued a temporary injunction, it responded immediately. It extended the voting deadline by three weeks. But what they did there, what the Supreme Court did, I'm trying to read the tea leaves a little bit as everyone does here, but they said don't count the votes, right? Yes, Your Honor. What we read as an intermediate court would be they want to develop a record, and so then they can see what the record would look like before, and then by not counting the votes, they can decide if, in fact, the violations that you're talking about are present in that developed record, which now we don't have. So I don't, what you say in terms of what the Supreme Court did, I guess I'm not looking at it exactly the same. I think they're, you know, you have unique issues here in Hawaii. I mean, this is one, I think the Kamehameha schools came up through the Ninth Circuit, and then the parties ended up, it was kicking around in the Supreme Court, and then the parties settled it, so the Supreme Court never, you know, touched kind of similar type of issues that you're talking about. So they're waiting for a developed record, and with the party that has pulled out now, we don't have that. Your Honor, I'm trying to read the same tea leaves, and the United States Supreme Court did not issue an opinion, but what we do know is this. The most important defense that the doesn't believe it can hold this election, and so on state action, if it's indisputably clear that we were entitled to relief on the delegate election, if that's indisputably clear, then it can't also be the case that there's a reasonable argument for state action, that there's a question about whether state action has occurred. Those issues have to have been decided by the Supreme Court, whatever other tea leaves we choose to read. Your Honor, I guess it's, you know, I guess if I give you, you know, I'm listening to your argument, and if in fact the organization had not dissolved, the arguments that you're making might be strong arguments for why the district court wasn't right on saying the likelihood of success on the merits, but at this point, the party's gone, so we don't even know who the next parties would be or what the lawsuit would look like, so it makes it really hard, even if we accept that every case looks different when, you know, you bring it. We don't know what the election would look like. We don't know who would hold it. We don't know when it would be. Your Honor, what you could enjoin, and we know that an injunction can extend beyond the basic request that you initially make for a case called Amerco for that proposition, but what we do know is that OHA created or worked with Nayaputi to come into existence and gave it 2.6 million dollars. I think it's very clear that an injunction against OHA from doing that again would be real relief, would be something that we could... Can you pursue, I mean, let's assume we, I don't know we're going to do exactly, but let's just assume that it's moot. I mean, your lawsuit remains pending before the district court, does it not? I mean, to resolve any other issues? Yes, it does, Your Honor, but I would think that to the extent that those issues were heard by the district court, it wouldn't concern mootness. It is not absolutely certain that this wrongful... Tell me, what would remain? What might remain is to determine whether there is a cognizable danger of a recurrent violation. That's the different standard, that's perspective relief, but I don't see how mootness can apply when the standard is so exacting. Clearly there's a... I understand what you think, but I'm just... Well, I guess it is, are we supposed to put our Hawaiian hat on and say that this is a consistent strain of an issue in Hawaii, so therefore it... No, Your Honor. It makes, you know, I mean, to enjoin something from happening that is inconsistent with your view of what OHA is doing wrong. Your Honor, I would simply say that we have a very real fear and belief, and that's justified by the facts and by the actions of the defendants, as to a recurrence of the violation that the Supreme Court found. It is not too strong to say that Nayapuni was created in order to give the defendants a state action defense. Did the Supreme Court find a violation? No, Your Honor. I mean, they just said, don't count the votes, and... Well, if it's indisputably clear that... I mean, they said, don't count the votes. Let us, you know, go back, give us a record, and then we'll tell you whether... I mean, I think maybe the Rice case, they're thinking in terms of, you know, voting rights violations and that sort of thing. That's true, Your Honor, but W.T. Grant said that you don't need to have a prior violation in order to be able to show a recurrent or cognizable danger of a recurrent violation. Your Honors, Nayapuni was created to give a state action defense to the defendants. It was dissolved to give them a mootness defense. Everything they've done has been with an eye to litigation and to advancing the ball in a way that makes us fear for a recurrent violation. I would like to reserve four minutes. Certainly. Thank you, Chief Judge Thomas, candidate Shanmugam of Williams and Connolly for the Office of Hawaiian Affairs at Belize. May it please the Court, since the District Court denied plaintiffs' motion for a preliminary injunction last fall, this appeal has been completely overtaken by events on the ground here in Hawaii. First and foremost, of course, the election of delegates, which the plaintiffs were challenging, was canceled back in December. Nayapuni then convened a four-week meeting to discuss Native Hawaiian nation-building efforts, the result of which was the proposed constitution for a Native Hawaiian self-governing entity. As this Court is well aware, no referendum for ratification of that constitution has yet been scheduled. Indeed, it is uncertain whether such a referendum will even occur, much less how and when that referendum will occur. Well, if you look historically, though, I think that Appellant's counsel makes a good argument. I don't think this is going away. You know, this is, I mean, this is, this is a very, you know, has been going on for a very long time, and I think it seems that Nayapuni has suddenly decided to dissolve, and that a new organization, though, what is it, the Aloha Lahui, has emerged to pick up where Nayapuni left off and pursue ratification. So, why isn't, you know, I mean, he's makes a, not, it's certainly a credible argument of how this is going to continue and is going to recur if you look at the historical overview here. So, Judge Callahan, just to be clear, I don't think there's really any dispute about the current state of affairs here in Hawaii. There is a group of individuals who have organized this movement, Aloha Lahui. There's no organization or separately incorporated entity. It's a group of individuals who are trying to raise money to conduct a referendum. But again, at this point, we don't know anything about the contours of that referendum, and if and when such a referendum becomes imminent, then plaintiffs will have a ripe request for injunctive relief. And as Chief Judge Thomas asked a minute ago, our view would be if they went back to the district court today, any challenge to the referendum would still be unripe. And let me give you a couple reasons why I think that that's true, because I think it's really important to understand why the constitutional analysis may be different if and when we get to that point. Of course, we don't know who's going to conduct that referendum, but we don't know who's going to be allowed to vote. We don't know whether that the role exclusively, whether they might use the role as a starting point. And importantly, and really critically, I think for purposes of analyzing the constitutionality of a ratification referendum, the role of the federal government becomes relevant here. Because as this court is aware, the Department of the Interior has proposed a rule for the recognition of a Native Hawaiian self-governing entity. No final rule has yet been published, but we anticipate that that final rule, like the proposed rule, will set out criteria for the election that will be relevant to the ultimate recognition determination. So all this will take place against the backdrop of whatever action the federal government takes. What did the Supreme Court say here, in your view? So the Supreme Court, of course, didn't say anything, Judge Callahan, in the order. At most, it made a preliminary determination, and of course, it was a preliminary determination about the likelihood of success on the appeal challenging the now-canceled election for delegates. Now, even if the election... It wasn't canceled, though, at the time, when the Supreme... That is correct. So the Supreme Court was obviously making a very expedited determination about the likelihood of success. Now, even if the election for delegates were still occurring, the Supreme Court's preliminary determination would not have bound this court. It certainly is not the case that simply because the Supreme Court makes a decision to enter a stay pending appeal, that that would resolve the appeal itself. But of course, all that the Supreme Court was focusing on was its assessment, on the fly, because this was all done on a very expedited basis, of the likelihood of success on the underlying claims in the appeal, which at the time would have, of course, been claims relating to the election for delegates. Once Nayyipuni made the decision to change the election, the plaintiffs started to shift the relief that they were seeking. And that relief has shifted throughout the course of briefing before this court, in plaintiff supplemental brief, and again here today at oral argument. Now, plaintiff's claim is, well, the reason that our relief is shifting is because events on the ground have moved on. And that is certainly true. There is a great deal of desire on the part of all of the appellees, including the Office of Hawaiian Affairs appellees, to maintain the momentum behind the Native Hawaiian nation-building process. It seems a very unique environment in the sense that I believe that the Native Hawaiians have unsuccessfully attempted many times to get congressional recognition, much like Native Americans, correct? And that it's unusual when you see something from the state, they're recognizing, well, if there's state action, we won't be affirmed by the Supreme Court, so we give the money to other people to do that. So I think he's arguing a little bit that it's an issue that they're making evade review of what otherwise the Supreme Court would strike down. I would say two things in response to that, Judge Callahan. First of all, in addition to there being a general desire to move the nation-building process along, there is obviously a desire on the part of the defendants to comply with all applicable requirements and to do so in a legal manner. That should hopefully go without saying. But I think that in large part, I don't want to speak for Nayapuni because my colleague, Mr. Minkin, will do so, but I am quite confident that Nayapuni made the decision to cancel the election in part because once a stay was entered, there was obviously going to be a potentially quite lengthy delay in the process by virtue of the fact that there was a stay in effect. All of that is just simply to say that the defendants in this case have sought to conform their conduct to the applicable legal requirements. The second thing I would say is that I think it's important to realize because I think with respect to my friend, Mr. Popper, I think he creates some confusion on this score. It's important to realize that the plaintiffs in this case in seeking injunctive relief were not seeking to enjoin either the use of the role or either the creation of the role. They were seeking to enjoin the election itself and the use of the role in connection with that election. In other words, the reason why my clients are here and the reason why the state appellees are here is because the plaintiffs were using the creation of the role and the provision of funding as a hook to have state action in order to challenge the election. They were not pursuing freestanding claims against the creation of the role or against the funding itself. And I think that's for good reason because, as we have alluded to in the briefing in this case, the mere creation of the role without more does not affect any constitutional violation because it doesn't involve any disparate treatment on the part of the state. And the mere provision of funding without more does not give rise either to a constitutional violation or to any sort of irreparable harm that would justify an injunction. But the injunction does request expressly, I think, extended to racially exclusive elections. So is that not enough to extend the request to what counsel's arguing for today? So Judge Merguia, you are right that at page three of the preliminary injunction motion, there is a reference to racially exclusive elections in the plural. But I would urge you to take a look at all of the briefing on the preliminary injunction motion because I think it's quite clear from that briefing that the plaintiffs ultimately were seeking an injunction against the election for delegates and the election for delegates alone. And the best evidence of that is what Judge Seabright said in his order at page 67 of the record excerpts. He said that, quote, the only question before the district court was the legality of this particular private election. And we believe that that's the only issue before the court today. And by virtue of the fact that the election has been canceled, the appeal is effective relief. Let's go back to that just for a little bit. I mean, we tend to be a little bit suspicious sometimes when a defendant voluntarily ceases challenged conduct and then argues the case is moot on that basis. So I know what you argued just a few minutes ago is that we don't know what happened in terms of another group. But isn't it possible that another organization made up of the same individuals will quickly try to hold a ratification vote using the disputed Native Hawaiian rules? So I would say two things about that, Judge Murgia. I mean, first of all, it is certainly true that the defendant, when the voluntary cessation exception is invoked, bears the burden of showing that it is absolutely clear that the same conduct is not going to recur. So there's no dispute about the legal standard. But as Chief Judge Thomas suggested, this court, and any federal court for that matter, lacks the power to enjoin as yet unidentified parties. Obviously, whatever entity is going to conduct the ratification election may not even exist, but it's certainly not before this court. So this court would not have the authority to do so. But leaving that aside, I think it's critical to keep in mind that if and when such an organization decides to conduct a ratification referendum, plaintiffs will be back in the district court, and they may even be able to proceed on their current complaint by amending it. But regardless of whether they can proceed on the current complaint or on a new complaint, they can go back and file motion for a preliminary injunction. And it isn't as if this election is somehow going to take place so quickly that the plaintiffs aren't going to be able to obtain relief. The best evidence of that is that when the plaintiffs challenged the election for delegates, they were able, although they did not proceed in a particularly diligent fashion, they were nevertheless able to obtain review at all three levels of the court system until the cancellation of the election rendered the appeal moot. And so again, if and when there is a ratification election, and if and when we know how that election is going to be conducted, the plaintiffs can go back to the district court, and if necessary, they can seek expedition. But there's really no dispute that they'll be able to get resolution of those claims. Well, they could do that. And I think that's a good response to that. But my concern is also, and I think what they're raising is, are the hands of the judiciary going to be tied every time a private entity pursuing Native Hawaiian self-determination chooses to dissolve? So let's say they go back, and what they say happens really quickly with perhaps a loa lahui or whatever. And then Justice Kennedy does the same thing, or, you know, or the full court does the same thing. Then if that organization then dissolves, do they have a better argument in terms of recurrence? And if we were back here again? Well, I mean, if every time it's not going well, an organization dissolves, and so if there's... An organization is going to engage in the same conduct. Perhaps the analysis would be different. I think the only thing that gives me a little bit of pause, Judge Callahan, is that, you know, a court still has to comport with the requirements of Rule 65, and a court can't just go entering injunctions against third parties. Now, I think Mr. Popper's response to that, if I heard his argument correctly, is, well, you know, you at least have OHA in front of you, and you at least have the state in front of you. But again, plaintiffs were seeking to stop the election. They were not seeking an injunction against the creation of the rule, which after all has already been created, or against the provision of funding, because after all, at the time before Judge Seabright, OHA had already provided funding. If those are the claims... What is the status of funding right now? So, the status of funding is that OHA provided the funding to NAIA PUNI, and of course that took place even before the district court proceedings occurred. And do you have a pending request for funding? We have no request for funding for a ratification referendum, not least because there is no organization that has yet decided that they want to conduct that referendum. And so, you know, there's really nothing... Do you have the funds available to provide in the form of a grant, appropriated funds? Does OHA have those funds available to it? Well, OHA certainly has the funds from the trust available, and OHA, of course, disperses those funds pursuant to Section 5F of the Admission Act. But of course, this just illustrates why the issues are unripe, whether they are framed in terms of a challenge to the ratification referendum itself, or in terms of a challenge to the ancillary provision of funding in connection with that referendum. Since we don't know what the referendum is going to look like, it would be impossible to analyze the propriety of funding in connection with that referendum as a matter of, say, the 14th Amendment. And again, the plaintiffs have not sought an injunction in the district court against future funding, not least because I think that would raise all sorts of questions about whether that's the sort of thing you can enjoin. Whether they would have standing to challenge funding in isolation from an irreparable harm. These are all matters that, as a matter of appellate practice, should be left for the district court in the first instance. What would be left for the district court in terms of live controversies if the appeal is moot? You know, that's a good question. And if I heard Mr. Popper correctly, I think he suggested that perhaps they might pursue a challenge to the role or to funding in isolation. And it is certainly true that the claims in the complaint are somewhat broader than the request for relief that was framed in the motion for a preliminary injunction. And so, presumably, if this court were to conclude that the appeal is moot, that would be an issue to be litigated in the district court. Again, if the plaintiffs sought to amend the complaint or to proceed on their current claims to challenge a ratification referendum, we would certainly make the argument that that is as yet unripe because the ripeness standard turns on whether a claim involves, quote, contingent future events that may not occur as anticipated or indeed may not occur at all. And that is precisely the current status of the ratification. And with respect to the role, what are the day-to-day activities that are ongoing with respect to the role? So my understanding, and my colleague, Ms. Kalama, who is due to be up here, can speak to this directly, but my understanding is that the Role Commission is still accepting registrations. In other words, you can still go to the website and register. But the Role Commission is not currently taking any action. The Role Commission, in order to add names to the role, has to actually approve the addition of names, and my understanding is that no such activity is currently taking place. So the Role Commission still exists, but at the moment it's really not doing anything. Any further questions? Thank you. Okay, thank you. Good morning, Your Honors. Good morning. Please, the Court. Donna Kalama on behalf of the State Defendants' Appellees. I don't have any additional argument to add to what Mr. Shanmugam has done here, but I did want to confirm the response to the last question, that indeed the Role Commission is continuing to accept registrations at this time. And I'm happy to answer any other questions that the Court may have. Well, why don't you describe to us what are the ongoing activities on behalf of the State concerning any of these issues? I guess... You have the monies you can fund, but you don't, you haven't funded. You don't have a funding request. You are continuing to accept role applications, but not acting on them. Is that a fair summary? Right. Anything else? The Office of Hawaiian Affairs, right, is the one that has the funds, and Mr. Shanmugam has addressed that. And the role is accepting registrations, if people want to continue to do that. I'm not aware of any other activity that's happening at the state level. And apart from OHA, what actions, is the state undertaking any other actions? Not that I'm aware of, and I hope that I'm not misstating that, but I'm not aware of any other state entity that's involved in doing anything with regard to the role. What's kind of unique to Hawaii, though, is on the one hand, what Mr. Popper's saying is there would be actions that the state can't take, but then you give money to people that take actions in violation of what would be a... I mean, you give them money, but that would be a violation for the state to do it, in terms of discrimination laws. I guess I don't agree with that. I don't know. And perhaps Mr. Minkin is the best person to address that. There was a little bit of funds left over, my understanding, but whether that's gone back to the Office of Hawaiian Affairs, the funds are from the trust, not from state appropriated funds, correct? That's my understanding, yes.  Thank you, Your Honors. Mr. Minkin. Good morning again, Your Honors. I am here on behalf of Nia Puni. Nia Puni, basically, was a group of five kupuna elders that came together because they've been involved in this progression for a number of years and wanted to bring people together. They wanted to bring people together, but when they determined that that was not going to happen via an election, they canceled the election in December of 2015, and then set up what is called an AHA, which is a meeting assembly gathering convention, where people came together and discussed issues, and from that, without any input from Nia Puni, came out with a constitution, and where that goes is up to those individuals. Let me take the contrary view, just so that we can ask questions of both sides, and I think that the appellants would be saying, okay, the Supreme Court weighed in with a decent indication that they were locked on here, all right? Don't count the votes, and we're watching this, and not unlike Kamehameha, say, for example, and those similar issues coming out of Hawaii, so why couldn't you just as much look at what they did? You're saying, well, they didn't feel that they could unify, that they thought that they were going to lose, so they decided, okay, we're going to back away. We'll find someone else to start over. Maybe the Supreme Court won't lock on the next time, and we can, you know, get further along the way. I mean, that's what they're, sort of, the repetition, or capable of repetition, and trying to evade review, judicial review. I understand the question, and I don't think that's the situation. I think what we have here is a group of individuals that wanted to get people together. The people came together, and now whatever happens is their determination, but what's significant, and what keeps repeating itself, at least from the appellant's position, is that, well, somehow, the money, it's the money. Follow the money. If you follow the money, as an ex-prosecutor, you follow the money, and hopefully you get to where somebody's doing something, but they never claimed in the underlying action that the money, the giving of the money, equaled the state action, so to come here today and make that argument when they literally 180 degrees earlier, we should stop looking at the money as the issue. Now, the question... Just for a second, can you explain to me the technical status of your client? I mean, it was, what kind of entity was it initially formed as, a non-profit? Non-profit. All right, and so, articles of dissolution have been filed... With the State of Hawaii. And the Secretary of State has approved them, or does the Secretary need to? Secretary doesn't need to. Articles of dissolution filed with the Department of Commerce and Consumer Affairs. Publication in the newspaper, basically giving notice that we're being dissolved. Anybody has claims, come forward with those. So, pursuant to state statute, we've complied with every aspect of dissolution. And as the attorney for the entity, what you're now doing is processing any claims? Correct. And then, once the claims are processed, you file a tax return? Tax return, correct. And that's it? That's it. Basically, closing the door, shutting shop. I interrupted your thought, go ahead. No, just very briefly. So, once that AHA was held, no ratification is going to be sought by NAIA Puni, and that came out in March of 2016. The dissolution was April of 2016. We have literally folded our tent, and whatever happens, happens. But it's important to go back to the money again, because that seems to be the issue. What about it being repeated in the future? But you still would be a party in the district court, right? At this point in time, yes, subject to a motion, depending upon what plaintiffs wish to do in the district court. They could go with the current complaint. They can move to amend. We can work out an issue where we get dismissed via stipulation. Thank you, your honors. Thank you very much. We'll hear rebuttal. Thank you, your honor. Your honor, what I was hearing from Mr. Shanmugam was that he anticipates that the Department of the Interior's regs will be adopted. And he acknowledges that the effort is going forward to hold a ratification vote. And he acknowledges that there's funding. And he acknowledges that an organization could arise that would receive that funding, and then the vote would be accomplished. All of the defendants acknowledge that they would like that to happen. In those circumstances, there is a recognizable danger of a recurrent violation. And that, your honor, is why it's not... Except not by all of the defendants. One of them's dissolved. The violation would occur from a new party. It would, your honor, except the violation from OHA would remain. OHA, to the extent that it was involved in that state action... But my question is then, is that the relief you sought in this motion for preliminary injunction? Because the relief you sought was not to future funding. It was to the registration and the holding of the election. So how does the future funding come before us on this interlocutory appeal? It comes before you, your honor, on the basis of who was doing it. OHA created, and NHRC created the role, and paid Nayapuni, basically, to implement an election. And the defendants argue that there was a division, that it was Nayapuni that was doing this and not the other defendants. We maintained, and I respectfully submit that the Supreme Court concurred, that in fact, it was all in the family. It was the same entities who were conducting the election. It wasn't Nayapuni. It was Nayapuni and it's... I'm sorry, it wasn't OHA. It was OHA and its agents. Right. But the only thing... That's a good... I mean, that's your argument for a permanent injunction against OHA and the state. But that's not the relief you sought on the preliminary injunction, which is the only issue before us today. I mean, I don't see anything in your motion that says we should enjoin the state from further funding or further modifications of the role. So my question to you is, and I understand everybody's desire to get at the meat of this and deal with the merits, and I get that. But I mean, in terms of what's before us on appeal, it doesn't seem like the issue that you really... The relief you're really seeking is before us. Well, Your Honor, it shouldn't be the case that someone can avoid the court's jurisdiction in a preliminary relief setting by changing the facts on the ground and by moving something there. Everyone can see the big picture and where it's heading by moving it to the next step. At the time, we were moving to enjoin the delegate election. At the time that you filed your complaint, I mean, the big picture was evident to you, I think, even though there were some facts that had been changed in terms of funding. And you didn't include that. But Your Honor, we did. If you look at our reply brief, we describe all the places that we described the process, and we were seeking to enjoin the process. And we referred to Dr. Kuyo Osam's promises, and he's the president of Nayapuni, that they were going to hold a ratification election. We referred to this in our preliminary injunction motion. So it wasn't the focus. I mean, we had just weeks, we had days in order to enjoin an election of delegates that everyone thought was going to happen. It certainly wasn't the focus. But to the extent that it was the intention that a race-based viewpoint-restricted election not be a role, not be used in an election. Of course, we're looking at the next election. But it shouldn't be the case that a defendant can avoid the force of this court's jurisdiction by moving the ball down the road a little bit. Well, if the attitude still existed, your argument would have force. But here we have a dissolved nonprofit corporation. We don't have another corporation in place. And it may well be that your arguments about a permanent injunction may still have force with the district court. But what's there left to enjoin? The state hasn't been asked for funds. It's not appropriating funds. I mean, we don't have an entity that could accept the funds. What are we to enjoin on a preliminary basis pending review of the district court? The use of the role, the use of the role by defendants. I mean, I guess I would put it this way. Your Honor asked what is left for the district court to do. If this court determines that there are not sufficient facts to show a cognizable danger of a recurrent violation, the district court can determine that. But the injunction itself has always been concerned with the entire process and where it is at each point in time. That would be left for the district court. But in terms of mootness, to show that there's absolutely no danger of a recurrent violation, this court could dismiss for mootness. And tomorrow, the same officers could form a new corporation with a new name, a new nonprofit. It would get funding. And in four months, it would be signing contracts. For four months, you can get relief. It's not that difficult to get in front of the district court and even our court. You'll have a case already ongoing. We will, Your Honor. But why should we, why should this court not enjoin the Office of Hawaiian Affairs from putting us to that defense when the Office of Hawaiian Affairs is in front of you now? And the Office of Hawaiian Affairs has the money to make this go forward, and they want to. I think, Your Honor, we respectfully submit this falls under the cognizable danger of recurrent violation, not ripeness and not mootness. Further questions? Thank you for your arguments. Good morning, Your Honors. My name is Walter Shetley, and I represent the only individual parties in this case. And those are the five Native Hawaiians, as Native Hawaiians is defined in the Hawaiian Homes Commission Act, the same five Hawaiians who brought the case in Kahawai Ola'a versus Norton, in which we were seeking to eliminate the discrimination that precludes Native Hawaiians from seeking recognition as tribal entities. And the court, your court, said that's okay because Native Hawaiians have the Hawaiian Homes Commission Act. Now, we don't have the Native Hawaiian, we don't have the Hawaiian Homes Commission Act. That has not been implemented by the state. And in fact, there's 50,000 acres of Hawaiian homes, of the 200,000 acres is up on Ola'a, and it's covered with gorse. So, anyway... Well, you don't... The first issue... Excuse me, you don't address in your briefing about whether this could be moot. If the other one's moot, what happens to you? Okay, as far as mootness is concerned, my initial impression was, as soon as they canceled the election, it's moot, the appeal anyway. And of course, the question then is whether the whole case is moot. I don't think the whole case is moot, but if the appeal is moot, go back to the district court, they're going to say the whole case is moot. Of course, the case is going to be dismissed and we're going to be back here. But anyway, as far as that is concerned... I guess if the appeal that we just finished, if this court were... And I'm just talking hypothetically. If this court were to determine that the preliminary injunction that's on appeal, if that's moot, the court isn't saying that's a whole different issue about what goes on in the district court and for the final injunction. But if we were to find that the preliminary injunction appeal is moot, is your appeal moot? Certainly not. We sought to intervene because we think that the voting should be limited to Native Hawaiians as defined in the Hawaiian Homes Commission Act. The plaintiffs... So what is your best argument that intervention is warranted, if we were to get to the merits? What's the significant protectable interest that you seek to protect that you'd be impaired from The plaintiff's interest is in being entitled to vote, which they're not, some of them. And our interest is in preventing people to vote from voting who shouldn't be voting. Same exact interest, except it's on the other side. Our interest is to limit the voting to Native Hawaiian beneficiaries. If this is going to be a Native American entity... No, but if you say your interest is exactly the same as a party that's already in the lawsuit, then why do you need to intervene? Because the resolution of that issue then would protect you. Our interest is the same, but it's on the opposite side, okay? Our interest is in restricting voting. Their interest is in expanding voting. They are not representing our side because we are trying to restrict voting. They're trying to expand voting. So that's why there's no protective... time can represent our interest. Now, and the other thing is that all of this nonsense is being funded by my client's money. My clients are the beneficiaries of the trust. Their money is being used for all of this nonsense. In Kahawaiola'a versus Norton, we pointed out there are other entities that already exist that are Native Hawaiian entities. There's Kalahui, there's the Hawaiian entities, there's homestead associations, all kinds of entities that could be recognized as Native Hawaiian entities. The state does not want to recognize those entities. They want to create their own entity that's nothing but a puppet entity that will... with whom they can negotiate to get rid of 5F and the Hawaiian homes and turn over Kahawaiola'a. This is the way that I think we're losing a little bit of focus here because the main question with respect to your intervention request is to figure out how the resolution of the plaintiff's lawsuit would impair your ability to protect your interests. So can you help me understand that? Because it seems like you would still be able to proceed in protecting your own interests, you know, separately. There are like 40,000 Native Hawaiians as defined in the Hawaiian Homes Commission Act. There are 500,000 Hawaiians who are going to be entitled to vote. And if they want to include, expand that, there's going to be everybody's entitled to vote. This is what happened in Rice. But how would that prevent you from bringing a separate challenge based on the definition of Native Hawaiian? A separate challenge, okay. If this court decides that the voting should be expanded, how can I have another court say that the voting should be restricted? It has to be decided in the same case. Are you going to expand the voting or are you going to restrict the voting? This is what happened in Rice, you know. I mean, people came in and said we should be able to vote for OHA because that's a racial discrimination. Well, the state comes back and says no, it's a Native American restriction, Mancari versus Morton. And the Supreme Court said no because you have all these Hawaiians involved. And our position would have been, okay, get rid of those Hawaiians, restrict it to Native Hawaiians, then you can have only Native Hawaiians voting under Morton versus Mancari. And it is a Native American entity analogous to a tribal entity. So would you agree that your breach of trust claims are not before the district court? Well, we've raised it. I know you raised it, but I mean that's not the subject of the district action. So I mean the district court said, look, you're trying to expand this case beyond the contours defined by the plaintiffs and the defenses raised into a breach of trust case, which isn't before me. And that's a separate issue. So how do you respond to that? Well, that's an issue, I think. But the main issue is we're trying to restrict the voting, not expand it. That's the main issue, the reason that we should be able to intervene. Having intervened, I think we could complain about them using all the money that's for a purpose that is improper. Do you want to reserve some time for rebuttal? Yes. Okay. Thank you, your honors, and may it please the court. I just have two quick points about this appeal. And of course, I'm happy to answer the- You want to say who you are on this appeal, since it's a separate one? We know who you are. Yes, Ken and Shan McGammon of Williams and Connolly, again here for the Office of Hawaiian Affairs Appellees. And your honors, let me just make two quick points. First of all, to hear Mr. Shutley today, it sounds as if he is suggesting that the claims here are really, the claims of the proposed interveners are really focused on voting. That is to say, the claims of voting should be limited to the narrower definition of Native Hawaiians. And to the extent that the claims of the proposed interveners are focusing on voting, they are moot for exactly the same reasons as was suggested in the prior oral argument. There is no presently pending election, and so any claims concerning voting with regard to the ratification referendum are unripe and would fail for much the same reason. Now, in his brief, Mr. Shutley suggests, and I think that the proposed cross-claim bears this out, that his clients are also Now, depending on how that claim is framed, it might or might not be dependent on an election. But if, in fact, the proposed interveners are challenging funding more generally without reference to any potential election, that claim really would fail under the requirements of Rule 24A, and in particular, as Judge Murigia suggested, the requirement that, in the words of the rule, a disposition of the action may, as a practical matter, impair or impede the movement's ability to protect its interest. Here, any disposition of the claims of the plaintiffs would have absolutely no bearing on a Section 5F breach of trust claim. Is there a way, if we were to hold, and this is a hypothetical, if we were to hold that in the last appeal that that were moot, would it be inconsistent, irreconcilably inconsistent to get to the merits of this intervention claim? Is there a theory wherein this might not be moot and we could reach the merits here? So, again, if the proposed intervener's claim was really being made without reference to either the now-canceled election or any future election, in other words, if it was just a generic challenge to OHA's provision of funding as a breach of the Section 5F trust, then perhaps plaintiffs could avoid mootness, but they'd have a really serious problem under Rule 24A. And, of course, if this Court dismisses the primary appeal here as moot, then the proposed interveners are going to be in the same place almost regardless, which is to say the proposed interveners can always, regardless of the disposition of this appeal, pursue their claims in a separate lawsuit. Our point is simply that to the extent that they can frame claims that have no effect on the proposed intervener's claims, and the proposed interveners, of course, can pursue a Section 5F claim in a separate lawsuit. And notably, as Nayah Pooney points out in its brief, in fact, the proposed interveners did file a separate lawsuit. It was never served. In that case, it has essentially been held in abeyance. So, I mean, arguably, there is a way that this appeal could not be, is not moot and could get to the merits. If this appeal were not moot, I think that proposed interveners would fail the requirements of Rule 24A for the reasons that Judge Seabright set out in his separate order denying intervention. The proposed interveners here are really trying to broaden the case. And in that situation, the ordinary judicial response is to say, go and file a separate lawsuit. And, in fact, the proposed interveners have done that. So there would really be no prejudice to them if this Court were to either dismiss their appeal as moot or to serve the complaint and proceed on it. Now, of course, these Section 5F claims are not new. And this Court rejected materially identical claims in Day v. Apolliona. And so I would respectfully submit that the disposition of those claims on the merits would not be terribly challenging. But, of course, the plaintiffs remain free to go back to the District Court and proceed on their separate complaint if they wish to do so. Unless the Court has any further questions, we would ask that the appeal is either dismissed or that the District Court is affirmed. Thank you. Mr. Minkin? Thank you, Your Honor. Just very briefly, David Minkin again on behalf of Nye Iyapuni. Based upon the reply that Mr. Shotley filed, they no longer seek to prevent the private Nye Iyapuni election using the roll. They merely seek to enjoin the use of Section 5F funds for such purpose. And as Judge Thomas indicated, is that the breach of trust claim yet again? And the answer is, yes, it is. So based on that, they would attempt to expand what's already here in the current lawsuit. They have the ability, and Judge Seabright laid it out. They could file their separate lawsuit. They've done that. For whatever reason, they have not decided to serve that lawsuit. So it was administratively held. But what's curious is that we now have a situation where Mr. Shotley is arguing, well, we're going to get two different opinions based on an election. Well, he framed the issue as the breach of trust. That's his issue and has already been pointed out. This court in Dey has already denied that claim. We believe that no matter whether it's moot or whether it's on the merits, this intervention as a right should be denied on appeal. Thank you. Thank you. Mr. Popper, you don't have a dog in this fight, I gather. Okay, very good. I just wanted to make sure that you didn't want to say anything. I know you didn't file a brief on this one, but I wanted to... Go ahead, Mr. Shotley. Okay, we keep getting this thing confused as to whether we're talking about mootness of the Well, you know, I think the whole case should have been dismissed when the appeal was done and the election was canceled. And then we could deal with a new case altogether. But the fact is that if only the appeal is dismissed and the case is sent back to the district court, the plaintiffs are going to be seeking to expand the voting qualifications. And if that is granted, we cannot seek relief in another case that is inconsistent with that. Well, why isn't it sufficient if you serve your other complaint and then ask for the cases to be consolidated? Well, it would be, but I mean, it's an unnecessary step and it could be denied because here we are and we're trying to restrict the voting rights. Now, Mr. Mencken says that I changed my position in the reply brief. I'm getting kind of old, but I don't even recall filing a reply brief. But if I said something like that, it shouldn't have been said because what plaintiffs are concerned about is expanding the voting and even having the voting be what it is now. The voting should be limited to native Hawaiians, as Justice Breyer said in Rice. You never heard of an Indian tribe that didn't have a blood quantum. So, I mean, this whole idea of setting up an Indian tribe without a blood quantum is contrary to Indian law. And there's no reason to distinguish between Hawaiians on that issue. Now, except Congress has rejected consistently the native Hawaiians to get the same status as the tribes, right? Congress established the Hawaiian Homes Commission Act, which is the analogy to tribal recognition, okay? They gave the native Hawaiians 200,000 acres of land for the definition is one-half part of the blood. That's the qualification. And the state wants to get rid of that, so they bring in 400,000 more people to vote against it so we could get rid of that. You take Kahoolawe. This is what they've been doing to Native Americans since the beginning of time. So, you know, when do the native Hawaiians who are supposed to be entitled to homesteads get their homesteads? They're using this money to create entities that are going to get rid of that. And we do not have the ability to go into a separate suit. As the issue is raised here, our counter issue should be raised here. If the whole case is dismissed, fine. We have a new case, we'll try to intervene in that one. If the appeal is dismissed, we should, if the other appeal is dismissed as moot, then our appeal still should be alive and go back down and participate. Thank you, counsel. Thank you very much. The cases just heard will be submitted for decision, and before we leave, I wanted to acknowledge the presence of Mr. Lilly at council table today. So, welcome, sir, and good to see you again. And we'll be in recess for the morning. All rise.
judges: Thomas, Callahan, Murguia